UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HERAYER BAGHOUMIAN,

                               Petitioner,

                  - v. -

UNITED STATES OF AMERICA,

                               Respondent.

**ORDER**

14 Civ. 8683 (PGG)

10 Cr. 895-5 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On March 2, 2012, Petitioner Hemayer Baghoumian pleaded guilty to
racketeering conspiracy, in violation of 18 U.S.C. § 1962(d).[1]  On April 12, 2013, this Court
sentenced Baghoumian to 135 months' imprisonment, and three years' supervised release.  (See
No. 10 Cr. 895, Judgment (Dkt. No. 649))  Baghoumian moves, pursuant to 28 U.S.C. § 2255, to
vacate his sentence.  (No. 14 Civ. 8683, Mot. (Dkt. No. 1))  For the reasons stated below,
Baghoumian's motion will be denied.

# BACKGROUND

## I.   FACTS AND PROCEDURAL HISTORY

### A.   Indictment

Indictment 10 Cr. 895 (PGG) was filed on September 30, 2010, and charged
twenty-eight defendants with a massive nationwide scheme to defraud Medicare of more than
$100 million.  The fraud scheme involved "stealing the identities of doctors, setting up fake
medical clinics in their names, and then stealing identities of patients so that Medicare could be

---

[1] Baghoumian entered his plea before Magistrate Judge Katz.  This Court accepted
Baghoumian's guilty plea on April 11, 2013.  (See No. 10 Cr. 895, Order (Dkt. No. 646))

billed for millions of dollars of fictitious medical treatments." (No. 10 Cr. 895, Indictment (Dkt. No. 3) ¶ 12(a)) In connection with this scheme to defraud Medicare, Baghoumian was charged with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and conspiracy to commit fraud in connection with identity theft, in violation of 18 U.S.C. §§ 371 and 1028(a)(7). (No. 10 Cr. 895, Indictment (Dkt. No. 3))

### B. Guilty Plea

#### 1. Plea Agreement

On March 2, 2012, Baghoumian entered into a plea agreement with the Government. Baghoumian agreed to plead guilty to Count One of the Indictment, which charged him with racketeering conspiracy. The plea agreement set out the maximum sentence for the offense – 20 years' imprisonment. (Plea Agmt. (Dkt. No. 977) at 1)

In the plea agreement, Baghoumian and the Government entered into the following stipulations concerning application of the Sentencing Guidelines: (1) the base offense level is seven; (2) a 20-level enhancement applies pursuant to § 2B.1.1(b)(1)(K), because the loss amount attributable to Baghoumian is between $ 7 million and $20 million dollars; (3) a two-level enhancement applies pursuant to § 2B1.1(b)(10)(c), because the offense involves sophisticated means; (4) a four-level enhancement applies pursuant to § 2B1.1(b)(2)(c), because Baghoumian's offense involves 50 or more victims; and (5) a three-level reduction pursuant to §§ 3E1.1(a) and (b) would be appropriate, if Baghoumian demonstrated acceptance of

responsibility prior to the imposition of sentence. (Plea Agmt. (Dkt. No. 977) at 3-4) Pursuant to these calculations, the parties agreed that Baghoumian's total offense level is 30.[2] (Id. at 4)

The parties also stipulated that – "[b]ased upon the information now available to [the U.S. Attorney's] Office (including representations by the defense)" – Baghoumian has zero criminal history points, placing him in Criminal History Category I. (Id.) The parties further agreed that at offense level 30 and Criminal History Category I, Baghoumian's Guidelines sentencing range is 97 to 121 months' imprisonment. (Id.)

The plea agreement also addresses the possibility that new information relevant to Baghoumian's sentence would be discovered after his guilty plea: "[N]othing in this Agreement limits the right of the parties . . . to seek an appropriately adjusted Guidelines range if it is determined based upon new information . . . that the defendant's criminal history category is different from that set forth above." (Id.) The plea agreement further states that "[i]t is understood that . . . neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts," and that "the sentence to be imposed . . . is determined solely by the Court . . . . [The U.S. Attorney's] Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive." (Id. at 5) Baghoumian and the Government further agreed that "defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Stipulated Guidelines Range." (Id.)

---

[2] The plea agreement observes that the 2010 Guidelines should be applied because, "by applying the enhancements under Section 2B1.1(b)(8) of the 2011 Guidelines, ex post facto concerns may be implicated." (Plea Agmt. (Dkt. No. 977) at 3 & n.1)

Finally, Baghoumian agreed that he would not file a direct appeal or collaterally challenge any sentence within or below the Stipulated Guidelines Range of 97 to 121 months' imprisonment. (Id.)

## 2.    Rule 11 Proceeding

On March 2, 2012, Baghoumian pled guilty to Count One of the Indictment before Magistrate Judge Katz. Judge Katz informed Baghoumian that Count One carried a maximum statutory penalty of twenty years' imprisonment. (Plea Tr. (Dkt. No. 978) at 2) Baghoumian told Judge Katz that he had "had a chance to discuss the charges in the indictment with Mr. Cooper[, his lawyer], and [to discuss] how [he] wish[ed] to plead." Baghoumian also told Judge Katz that he had spoken "with Mr. Cooper about how the United States Sentencing Guidelines appl[ied] to [his] case." Baghoumian also affirmed that he was satisfied with his attorney's services. (Id. at 5-7)

Baghoumian also acknowledged that he understood that although he and the Government had "reached some understanding . . . about the sentencing range [Baghoumian] face[d] under the [G]uidelines, that's not binding on Judge Gardephe and the sentence to be imposed lies solely in his discretion." (Id. at 10) When Judge Katz asked whether Baghoumian "underst[ood] that even if Judge Gardephe were to impose a more severe sentence than . . . 121 months in prison, that would not be a basis for [him] to withdraw [his] plea of guilty," Baghoumian answered, "I understand that." (Id.)

Baghoumian also assured Judge Katz that his guilty plea was voluntary:

The Court: Have any threats been made to you by anyone which are causing you to plead guilty today?

Defendant: No.

> The Court:  Have any promises been made to you about the sentence you will receive?
>
> Defendant: None.
>
> The Court:  Did you enter into a plea agreement with the government?
>
> . . .
>
> Defendant: Yes.
>
> The Court:  Have you read and signed that agreement?
>
> Defendant: I did.
>
> The Court:  Have you discussed it with Mr. Cooper?
>
> Defendant:  We did.
>
> The Court:  Do you understand what it said?
>
> Defendant: I understand.
>
> . . .
>
> The Court:  Is your plea made voluntarily and of your own will?
>
> Defendant:  Voluntarily.

(Id. at 8-9, 11)

As to the factual basis for Baghoumian's plea, the Government "proffer[ed] . . . that part of the scheme was the theft of patient[]s['] identities," on behalf of whom "false Medicare claims were submitted." (Id. at 12)  Baghoumian then allocuted that

> [d]uring the period of time alleged in the indictment . . . I participated with [co-defendant Davit] Mirzoyan and others to engage in a pattern of activity that included mail, wire, and bank fraud, [the object of which] was to commit healthcare fraud. . . . As part of my role, I assisted in submitting the numerous claims to Medicare that I knew were related to either fictitious or unknown individuals, as well as fictitious treatments at medical clinics in the United States with the intent to obtain money for which there was no legitimate medical claim.

(Id. at 12-13)  Baghoumian further stated that (1) the telephone, mail, and wires were used to commit the fraud; and (2) Medicare submitted payment for the fraudulent claims electronically,

transmitting monies to banks and bank accounts that co-conspirators had set up to receive the

fraud proceeds. (Id. at 14-15)

        Finally, Baghoumian's counsel informed Judge Katz that he and his client

[H]ave had ample discussions with respect to this [plea]. And I'll state on the
record that I have discussed with Mr. Baghoumian specifically the effects of [§]
3553(a) and how it might impact on his case. And we have discussed those issues
that I would intend to raise. The government is aware of, certainly, a number of
those that I intend to raise. So while it is very clear that the stipulated guideline
range is 97 to 121 months, Mr. Baghoumian is aware that I intend to raise 3553(a)
issues with respect to reasonable sentence before Judge Gardephe at the time.

(Id. at 15)

## C.    **Presentence Investigation and Report**

        The Probation Office issued a Presentence Investigation Report ("PSR") on July

19, 2012. According to the PSR, Baghoumian "played [a] key role[] in the [charged racketeering

enterprise]," as a "principal partner[] in operating the health care fraud scheme." (PSR ¶ 73) In

particular, Baghoumian "monitored the flow of fraudulent funds from the clinics, and reported to

[co-defendant Davit] Mirzoyan [– the leader of the enterprise –] on the status of particular

accounts regularly. Baghoumian also assisted Mirzoyan in obtaining new 'patients' – i.e. stolen

identities – to use to bill [the phony] Medicare clinics. Baghoumian also assisted the money

laundering operations of [the racketeering enterprise] . . . and received hundreds of thousands of

laundered funds over the life of the offense, including payments from a Las Vegas casino where

the conspirators exchanged money through chips, and from a gold dealer." (Id. ¶ 74)

        In determining offense level, the Probation Office employed the same calculations

set forth in the parties' plea agreement, and arrived at the same total offense level of 30.[3] (Id. ¶¶

---

[3] As to the sophisticated means enhancement, the PSR explains that "[t]he instant offense
involved a scheme to trick Medicare into thinking that dozens of healthcare clinics existed that in

6

105-07) As to criminal history, however, the Probation Office discovered two convictions of which the Government had been unaware when the parties negotiated the plea: a 2006 Nevada conviction for Driving Under the Influence ("DUI"), for which Baghoumian was sentenced to a fine; and a 2009 California conviction for DUI, for which Baghoumian was sentenced to three days' imprisonment (suspended) and three years' probation. (Id. ¶¶ 118, 120) Baghoumian's term of probation expired on January 19, 2012. (Id. ¶ 120)

The Probation Office assessed one criminal history point for each conviction, and assessed two additional criminal history points because Baghoumian had committed the instant offense while on probation. (Id. ¶ 122) Four criminal history points correlates with Criminal History Category III. Offense level 30 at Criminal History Category III yields a Guidelines sentencing range of 121 to 151 months' imprisonment. (Id. ¶¶ 123, 162)

## D. Sentencing Submissions

In his January 21, 2013 sentencing brief (No. 10 Cr. 895, Def. Br. (Dkt. No. 603)), Baghoumian raised a number of objections to the PSR. First, Baghoumian argued that he was not a "principal partner[]" of Davit Mirzoyan – a key leader of the charged racketeering enterprise – and that he had not "assisted Mirzoyan in obtaining new 'patients' – i.e. stolen identities – to use to bill Medicare clinics." (Id. at 2) Baghoumian also objected to the PSR's assertion that his money laundering had included payments from a Las Vegas casino. (Id. at 2-3)

Baghoumian further argued that his 2009 DUI conviction had been the result of a nolo contendere plea. (Id. at 4) While acknowledging that the nature of the plea "does not affect the guideline assessment of a criminal history point," Baghoumian stated that "the nature of the

---

fact did not. The conspirators created 'paper' clinics in the names of stolen doctor identities and then submitted phony billings in the names of stolen patient identities." (PSR ¶ 107)

7

plea and the sentence w[ould] be part of the defendant's argument with respect to the Guideline calculation and suggested sentence." (Id. at 4)

Baghoumian also pointed that while he was on probation at the time of the instant offense, his court supervision was "theoretical," because he "was never in fact supervised in any manner." (Id. at 6). Baghoumian acknowledged, however, that the Sentencing Guidelines' application notes "specifically state[] [that] a term of unsupervised probation would be included in assessing two additional criminal history points" for commission of the offense while under supervision. (Id.) Accordingly, Baghoumian did not contend that the criminal history score calculated in the PSR was incorrect. Baghoumian argued, however, that the effect of the 2009 DUI conviction on his criminal history score was "excessive when considered under 18 U.S.C. § 3553(a)," because his actions "resulted in no harm to anyone else," and because there was no connection between the instant offense and the conduct underlying the 2009 conviction. (Id. at 6-7) The defense urged the Court to treat Baghoumian as if he were in Criminal History Category I, arguing that it was "inappropriate and unwarranted" for his sentence to be enhanced given "the lack of both prison sentence and actual supervision for the [DUI] offense. (Id. at 7)

Finally, Baghoumian urged the Court to consider (1) the effect of his likely deportation; (2) Baghoumian's culpability relative to that of a co-defendant with a lower stipulated Guidelines range; and (3) letters of support from Baghoumian's family, friends and spiritual advisors. (Id. at 9-11) The defense argued that "an appropriate and reasonable sentence for Herayer Boughamian would be reflected by a sentence Guideline range of 63-78 months['imprisonment] with a sentence at the bottom end of that range." (Id. at 11)

At no point in his sentencing submissions did Baghoumian contend that the Sentencing Guidelines calculations set forth in the PSR were incorrect.

The Government sought a sentence within the Guidelines range set out in the PSR. (10 Cr. 835, Govt. Br. (Dkt. No. 628))  The Government maintained that Baghoumian "was one of Mirzoyan's principal associates in the Medicare scheme and played a major role in the billing done by the phantom clinics." (Id. at 5)  While Baghoumian denied involvement in identity theft, the Government asserted that "[a]t the very least there is evidence that Baghoumian worked with Mirzoyan to use stolen patient identities to use to bill Medicare through various clinics," pointing to references to such stolen identities in intercepted telephone calls. (Id. at 8-10)

### E.    Sentencing

Baghoumian was sentenced on April 12, 2013.  At sentencing, Baghoumian confirmed that he had read the PSR and discussed it with his counsel. (Sentencing Tr. (Dkt. No. 980) at 2)

As to Baghoumian's factual objections to the PSR, the Court stated that it would disregard the PSR's description of Baghoumian as a "principal partner[]" of Mirzoyan; the allegation that Baghouman obtained stolen patient identities from Mirzoyan; and the allegation that Baghoumian had laundered fraud proceeds through a Vegas casino. (Id. at 3)  However, the Court observed that it was

> undisputed that [Baghoumian] was intercepted on numerous phone calls discussing with Mirzoyan fraudulent billing involving a dozen, or so, phony clinics.  He was also intercepted discussing with Mirzoyan how hundreds of stolen patient identities would be used to submit fraudulent bills to Medicare.  He monitored the flow of fraudulent funds from the phony clinics and reported to Mirzoyan on the status of accounts relating to those clients. The defendant stipulated to a loss amount of between seven million and $ 20 million.

(Id. at 3-4)[4]  As to Baghoumian's assertion that his DUI plea had been nolo contendere, the

Court ordered that the PSR be amended to reflect that fact.  (Id. at 4)  The Court ordered further

corrections as to certain of Baghoumian's relatives and typographical errors, and then asked

defense counsel whether there were "any other factual errors you want to point out" in the PSR;

counsel conferred with Baghoumian, and reported that there were none.  (Id. at 5-7)

       The Court then addressed the Guidelines calculations set forth in the PSR,

pointing out that (1) the parties had agreed in the plea agreement that Baghoumian had no prior

convictions; (2) the Probation Department had discovered two prior DUI convictions; and (3) the

DUI convictions (and Baghoumian's probation sentence) led to four criminal history points,

which put Baghoumian in Criminal History Category III, and resulted in a Guidelines range of

121 to 151 months' imprisonment.  (Id. at 9)  The Court then asked Baghoumian's counsel

whether he objected to the Guidelines calculations set forth in the PSR.  Counsel stated that he

could not challenge the calculation of criminal history points set forth in the PSR, and agreed

that the applicable Guidelines range was 121 to 151 months' imprisonment.  (Id. at 9-10)  The

Court then ruled that "the offense level is 30, the criminal history category is III, and the

applicable [G]uidelines range is 121 to 151 months' imprisonment."  (Id. at 10)

       In his remarks to the Court, defense counsel repeated the arguments set forth in

his sentencing brief:  Baghoumian's likely deportation; the sentences imposed on co-defendants;

the defendant's "history . . . , his family, the support he has from his family, . . . [the likelihood

of] future dangerousness," and the defendant's age.  (Id. at 13-15)  In Baghoumian's remarks to

---

[4]  The Government also observed that "the evidence is clear that the defendant was aware that
this was stolen identity information and that the defendant was using that stolen identity
information to bill Medicare."  (Sentencing Tr. (Dkt. No. 980) at 21)  The defense did not
dispute this assertion.

the Court, he expressed regret for the fraud he had perpetrated on Medicare, but asked for leniency in light of the likelihood of deportation. He did not express any concerns about the advice he had received from his attorney. (Id. at 17-18)

The Court then discussed in detail the nature and circumstances Baghoumian's offense (id. at 21-22), as well as his personal history and characteristics, including his family background, citizenship status, employment history, and criminal history. (Id. at 22-25) The Court then noted that it had "considered carefully the defendant's relative culpability compared to other defendants in this case" – fourteen of whom the Court had previously sentenced. The Court stated: "It's clear to me that Mr. Baghoumian's culpability is greater than almost all of the defendants sentenced to date. . . . He was intimately involved in the core criminal activities of the racketeering enterprise and he performed tasks that were critical to the operation of the Medicare fraud scheme." (Id. at 25, 27)

The Court found, however, that Criminal History Category III "overrepresents the seriousness of Mr. Baghoumian's criminal record," and granted a variance to reflect its conclusion that the more "proper criminal history category here is II" and the more appropriate range under the Sentencing Guidelines "is 108 to 135 months' imprisonment." (Id. at 27) The Court then imposed a sentence of 135 months' imprisonment, explaining that its "purpose in doing so . . was primarily one of general deterrence." (Id. at 28)

F.     **Appeal**

Baghoumian filed a notice of appeal.[5] (No. 10 Cr. 895, Notice of Appeal (Dkt. No. 711)) On appeal, Baghoumian argued that this Court committed procedural error in

---

[5] The Clerk's Office received Baghoumian's notice of appeal on July 26, 2013 – long after the fourteen days permitted for a criminal defendant to file an appeal. Baghoumian's notice of appeal papers state that on April 17, 2013, he mistakenly "sent a request to [the Second Circuit]

sentencing him without adequately considering mitigating circumstances, and that his sentence was substantively unreasonable because it was greater than the upper end of the Guidelines range contemplated in his plea agreement. See United States v. Baghoumian, 577 F. App'x 86, 87, 88 (2d Cir. 2014) The Second Circuit affirmed the judgment of this Court in a summary order issued on September 5, 2014. Id. at 88.

### G.     **Baghoumian's Petition**

On October 22, 2014, Baghoumian filed the instant petition. (No. 14 Civ. 8683, Mot. (Dkt. No. 1)). Baghoumian argues that his lawyer rendered ineffective assistance by failing to challenge (1) the four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(c), concerning the number of victims; (2) the two-level "sophisticated means" enhancement, pursuant to U.S.S.G. § 2B1.1(b)(10)(c); and (3) the 20-level loss amount enhancement, pursuant to U.S.S.G. § 2B.1.1(b)(1)(K). (No. 14 Civ. 8683, Pet. Br. (Dkt. Nos. 2, 2-1, 2-2)) Baghoumian also contends that his counsel did not adequately argue the Section 3553(a) factors. (No. 14 Civ. 8683, Pet. Br. (Dkt. Nos. 2-1, 2-2))

Baghoumian also appears to argue that his counsel was ineffective – and that he entered into the plea agreement involuntarily – because his counsel misinformed him about the potential effect of his DUI convictions on his sentence. (No. 14 Civ. 8683, Pet. Br. (Dkt. No. 2) at 6) According to Baghoumian, "defense counsel advised [him] that [his] previous DUI convictions could NOT be utilized and or [a]ffect the terms of the plea agreement relevant to the ultimate time [Baghoumian] was to be sentenced to." (Id.) Moreover, "even though the plea agreement designated a time of . . . [121] months [as the top end of the Guidelines sentence

---

notifying the Court that [he] wanted to appeal the judgment of the district court." (No. 10 Cr. 895, Notice of Appeal (Dkt. No. 711) at 1). The Second Circuit Clerk's Office states it never received such a request. (Id. at 5)

range], such counsel proffered as an inducement to sign and accept such plea that he believed

due to the minor role [Baghoumian] had, and further the extenuating circumstances set out under

the 3553(a) considerations, the first time offender, the age of such offender, and finally a large

host of supporting documentation favoring [Baghoumian], [counsel] relayed that [Baghoumian]

would likely be departed down to a sentence of approximately sixty eight (68) months." (Id.)

Lastly, Baghoumian maintains that "[a]t the discovery of the enhancement [due to his DUI

convictions], [Baghoumian] further attempted to withdraw from the plea[,] but was advised by

the same counsel to again 'don't worry about it[,]'[] it would be resolved in an appeal if it

became an issue and further reiterating that he still expected a lower term of incarceration . . .

again estimating such at sixty eight (68) months." (Id.)

### H.    Defense Counsel's Affirmation

In response to Baghoumian's petition and his allegations of ineffective assistance

of counsel, this Court directed Baghoumian's former lawyer – Gregory Cooper – to submit an

affirmation addressing Baghoumian's allegations. (See No. 10 Cr. 895, Order (Dkt. No. 859)) –

Cooper filed his affirmation on March 20, 2015. (No. 10 Cr. 895, Cooper Affirm. (Dkt. No.

861))

As to Baghoumian's primary arguments – that Cooper failed to dispute the

various Sentencing Guidelines enhancements, and did not effectively present the Section 3553(a)

considerations – Cooper responds that he believed the enhancement for the number of victims

was appropriately applied (id. ¶ 5 ("It was my belief that the number of victim[]s enhancement

concerned the stolen identities that were necessary to commit the Medicare fraud, not simply the

money paid out by the United States Government.")), and that he did not challenge the

sophisticated means enhancement because "that enhancement was a necessary component of the

government's plea offer, and based upon all the known information concerning the conspiracy and Mr. Baghoumian's role in it I believed any challenge to the enhancement would be unsuccessful, and could jeopardize the availability of the plea offer."[6] (Id.) Cooper also states that "[t]o the extent that Mr. Baghoumian asserts . . . that I failed to make arguments pursuant to 18 USC [§] 3553(a)[,] the record is there for the Court to decide that. . . . I can only state my belief that [the sentence was imposed] not because the arguments were not made – only that that they were not adopted by the Court." (Id. ¶ 4)

As to the advice he rendered about the effect of Baghoumian's DUI convictions, Cooper avers that "[i]t is [his] best recollection that Mr. Baghoumian had mentioned having only one conviction for Driving Under the Influence . . . ." (Id. ¶ 3) Cooper surmises that Baghoumian may not have mentioned his second DUI conviction because he did not plead guilty in that case; instead he pled nolo contendere. (Id.)

Finally, as to Baghoumian's assertion that Cooper told him that he expected a sentence of 68 months' imprisonment, Cooper maintains that he "clearly ha[s] no recollection of ever advising Mr. Baghoumian that he would receive a specific sentence." Instead, Cooper "advise[d] Mr. Baghoumian that [he] would be requesting the Court to sentence him to within a substantially lower guideline range of 63-78 months." (Id. ¶ 4)

## DISCUSSION

## I. LEGAL STANDARD

### A. Standard for Relief Under 28 U.S.C. § 2255

28 U.S.C. § 2255 provides, in relevant part, that "[a] prisoner in custody under sentence of a [Federal] court . . . claiming the right to be released upon the ground that the

---

[6] Cooper's affirmation does not address the enhancement for loss amount.

sentence was imposed in violation of the Constitution or laws of the United States . . . or that the sentence . . . is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside[,] or correct the sentence." 28 U.S.C. § 2255(a). "Relief under section 2255 is available only 'for constitutional error, lack of jurisdiction, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" Rosa v. United States, 170 F. Supp. 2d 388, 396 (S.D.N.Y. 2001) (quoting Graziano v. United States, 83 F.3d 587, 589-90 (2d Cir. 1996).

When ruling on a Section 2255 motion, the district court need not hold an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). "To warrant a hearing, the movant 'must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the movant] to relief.'" Mann v. United States, No. 15 Cr. 667-4 (KPF), 2016 WL 5900174, at *7 (S.D.N.Y. Oct. 11, 2016) (quoting Gonzalez v. United States, 722 F.3d 118, 131 (2d Cir. 2013)). However, "[a] court need not . . . credit factual assertions contradicted by evidence in the record of the underlying proceeding," and "when the judge who tried the underlying proceedings also presides over a § 2255 motion, a full-blown evidentiary hearing may not be necessary." Id. (internal quotation marks and citations omitted).

### B. Ineffective Assistance of Counsel

Courts analyze ineffective assistance of counsel claims under the framework set out in Strickland v. United States, 466 U.S. 668 (1984). "In order to prevail on a claim of ineffective assistance of counsel . . . , a habeas petitioner must satisfy a two-part test." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). The petitioner "'must demonstrate both "that

15

counsel's performance was deficient" and "that the deficient performance prejudiced the defense."'" Garner v. Lee, 908 F.3d 845, 861 (2d Cir. 2018) (quoting Waiters v. Lee, 857 F.3d 466, 477 (2d Cir. 2017) (quoting Strickland, 466 U.S. at 687))).

"The performance component of the Strickland test asks whether a 'counsel's representation fell below an objective standard of reasonableness.'" Kovacs v. United States, 744 F.3d 44, 50 (2d Cir. 2014) (quoting Strickland, 466 U.S. at 688). "A defense counsel's performance is unreasonable when it is so deficient that it falls outside the 'wide range of professionally competent assistance.'" Id. (quoting Strickland, 466 U.S. at 690). "When assessing counsel's performance, a court 'must judge his conduct on the basis of the facts of the particular case, "viewed as of the time of the counsel's conduct," and may not use hindsight to second-guess his strategy choices.'" Muniz v. United States, 360 F. Supp. 2d 574, 578 (S.D.N.Y. 2005) (quoting Mayo, 13 F.3d at 533 (quoting Strickland, 466 U.S. at 690)); see also Parisi v. United States, 529 F.3d 134, 141 (2d Cir. 2008) (warning of the risk that "in the illuminating light of hindsight, [courts] might look back and project ex post knowledge of consequences on the attorney's ex ante selection of one path among the many available to him"). Accordingly, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Parisi, 529 F.3d at 141 (internal quotation marks and citation omitted).

To establish prejudice under the second Strickland prong, a defendant "must demonstrate 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Garner, 908 F.3d at 861-62 (quoting Strickland, 466 U.S. at 694)).

## II.    ANALYSIS

### A.    Defense Counsel Was Not Ineffective in Advising
####         Petitioner to Accept the Plea Agreement

The Court understands Baghoumian to contend that his lawyer was constitutionally ineffective in recommending that he enter into the plea agreement, and that as a result his plea was not knowing and voluntary. (See No. 14 Civ. 8683, Pet. Br. (Dkt. No. 2) at 6) According to Baghoumian, his attorney "advised that the previous DUI convictions could NOT be utilized and or [a]ffect the terms of the plea agreement relative to the ultimate time [Baghoumian] was to be sentenced to."[7] (Id.) Baghoumian further asserts that Cooper "proffered as an inducement to sign and accept [the] plea that he believed due to the minor role that [Baghoumian] had, and further the extenuating circumstances as set out under the 3553(a) considerations, . . . he relayed that [Baghoumian] would likely be departed down to a sentence of approximately sixty eight (68) months." (Id.) Finally, Baghoumian suggests that Cooper persuaded him not to attempt to withdraw his plea – after the Probation Department discovered the DUI convictions and calculated a higher Guidelines range – by advising him that "it would be resolved in an appeal if it became an issue and further reiterating that he still expected a lower term of incarceration . . . again estimating such at sixty eight (68) months." (Id.) None of these allegations demonstrate that Cooper rendered ineffective assistance such that Baghoumian's plea was not knowing and voluntary.

To the extent that Baghoumian contends that he relied on Cooper's alleged promises that (1) his DUI convictions would not lead to a longer sentence; or (2) his sentence

---

[7]  Although Baghoumian's phrasing is not entirely clear, the Court understands him to assert that Cooper advised him that the DUI convictions would not change the Guidelines range set forth in the plea agreement.

would be approximately 68 months, these allegations directly contradict the text of the plea agreement as well as statements Baghoumian made when he pled guilty. "Solemn declarations in open court" – including "the representations of the defendant . . . at a [plea] hearing" – "carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977); see also United States v. Doe, 537 F.3d 204, 213 (2d Cir. 2008) ("Statements at a plea allocution carry a strong presumption of veracity.").

As to Baghoumian's claim that Cooper promised that he would receive a 68-month sentence, during the Rule 11 proceeding the magistrate judge asked, "Have any promises been made to you about the sentence you will receive?" Baghoumian answered, "None."[8] (Plea Tr. (Dkt. No. 978) at 8)

As to Baghoumian's assertion that he relied on Cooper's advice that the DUI convictions would not affect his sentence, Baghoumian repeatedly acknowledged – both in the plea agreement and during the Rule 11 proceeding – that he understood that he could not rely on anyone's prognostications about the application of the Sentencing Guidelines, particularly if new information emerged that was not addressed in the plea agreement.

During the Rule 11 proceeding, Baghoumian testified that he had read and signed the plea agreement. (Id. at 8-9) Given that the plea agreement does not mention Baghoumian's DUI convictions, Baghoumian was aware that these convictions had not been considered for

---

[8]  As noted above, Cooper denies "ever advising Mr. Baghoumian that he would receive a specific sentence." Instead, he "advise[d] Mr. Baghoumian that [he] would be requesting the Court to sentence him to within a substantially lower guideline range of 63-78 months." (Id. ¶ 4) The Court finds Cooper credible on this point, but even accepting Baghoumian's assertion that Cooper represented that Baghoumian would "likely" receive a variance down to 63 to 78 months (No. 14 Civ. 8683, Pet. Br. (Dkt. No. 2) at 6), "[e]rrors in counsel's predictions of a defendant's ultimate sentence . . . generally do not constitute ineffective assistance of counsel because such predictions are, by nature, only guesses or estimates." Hsu v. United States, 954 F. Supp. 2d 215, 221 (S.D.N.Y. 2013) (citing United States v. Sweeney, 878 F.2d 68, 70 (2d Cir. 1989)).

purposes of calculating his criminal history. (Plea Agmt. (Dkt. No. 977) at 4) The plea agreement expressly warns that the Criminal History Category specified in the plea agreement might differ from the Criminal History Category determined at sentencing if new information emerges, and that such a change could affect Baghoumian's Guidelines range: "[N]othing in this Agreement limits the right of the parties . . . to seek an appropriately adjusted Guidelines range if it is determined based upon new information . . . that the defendant's criminal history category is different from that set forth above." (Id.) The plea agreement also emphasizes that "neither the Probation Office nor the Court is bound by the [plea agreement's] Guidelines stipulation," and that "the sentence to be imposed . . . is determined solely by the Court. . . . This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive." (Id. at 5) Baghoumian also repeatedly acknowledged during the Rule 11 proceeding that he understood that the sentencing judge could impose a sentence more severe than that contemplated in the plea agreement. Indeed, when the magistrate judge asked Baghoumian whether he understood that "although [he] and [his] attorney ha[d] reached some understanding with the government about the sentencing range [he] face[d] under the [G]uidelines, that's not binding on Judge Gardephe and the sentence to be imposed lies solely in his discretion," Baghoumian responded, "you did mention that." (Plea Tr. (Dkt. No. 978) at 10)

Finally, Baghoumian expressly informed the court at the plea proceeding that his plea was voluntarily and freely made. (Id. at 11)

Given these representations, the Court concludes that Baghoumian's current claims concerning his reliance on Cooper's alleged promises about the sentence he would receive and his criminal history score are not credible. See Ramzan v. United States, No. 06 CR. 456 NRB, 2012 WL 3188847, at *7 (S.D.N.Y. Aug. 6, 2012) ("Based on [the contradiction

19

between petitioner's "sworn statements at his plea allocutions that he had discussed the terms of the agreements with counsel and understood them in full" and counsel's affidavit], we have little difficulty concluding that Ramzan's claims are not credible and therefore that Ramzan did not receive ineffective assistance with respect to counsel's understanding and communication of the plea agreements.")[9]

### B. Defense Counsel Was Not Ineffective in Failing to Object to Sentencing Enhancements

Baghoumian argues that Cooper was constitutionally ineffective in not objecting to sentencing enhancements premised on (1) the number of victims; (2) "sophisticated means"; and (3) loss amount. (No. 14 Civ. 8683, Pet. Br. (Dkt. Nos. 2, 2-1, 2-2)) Baghoumian's arguments are meritless.

As an initial matter, in the plea agreement, Baghoumian stipulated to all of the sentencing enhancements he now disputes.[10] (See Plea Agmt. (Dkt. No. 977) at 3) Generally, "[s]tipulations made knowingly and voluntarily are enforceable," Kapelioujnyi v. United States, 779 F. Supp.2d 250, 254 (E.D.N.Y. 2009), aff'd, 422 F. App'x 25 (2d Cir. 2011), and "[a]lthough stipulations are not binding, courts may rely on them 'in finding facts relevant to sentencing,'" Id. (quoting United States v. Granik, 386 F.3d 404, 411 (2d Cir. 2004)). As the

---

[9] The Court also finds credible Cooper's recollection regarding Baghoumian's DUI convictions. Cooper asserts – and Baghoumian does not dispute – that at the time of the plea, Cooper was aware of only one of Baghoumian's DUI convictions. It appears that Cooper was only aware of Baghoumian's first DUI conviction, and not the second conviction, which resulted in a sentence of probation. (No. 10 Cr. 895, Cooper Affirm. (Dkt. No. 861) ¶ 3) Although the 2006 DUI conviction results in one criminal history point, a single point would not affect Baghoumian's Criminal History Category; he would remain in Criminal History Category I. Accordingly, assuming arguendo that Cooper advised Baghoumian that the DUI conviction of which he was aware would not "[a]ffect the terms of the plea agreement relative to the ultimate time [Baghoumian] was to be sentenced to," such advice was correct.

[10] As discussed above, the Court has concluded that Baghoumian entered into the plea agreement knowingly and voluntarily.

Second Circuit has recognized, "factual stipulations are bargaining chips in the hands of defendants. Indeed, virtually every provision of a plea agreement – agreements not to argue for a downward or upward departure, to drop charges, to concede the defendant's role in the offense – is a bargaining chip in the hands of either the government or the defendant." Granik, 386 F.3d at 412. Because courts "may not use hindsight to second-guess [counsel's] strategy choices," Muniz, 360 F. Supp. 2d at 578, courts have rejected ineffective assistance claims premised on an attorney's failure to object to sentencing enhancements, as "counsel's decision not to object to the enhancements may have been a strategic decision employed to secure the plea agreement." Kapelioujnyi, 779 F. Supp. 2d at 255.

Here, Cooper asserts precisely that as to the enhancement for "sophisticated means." In his affirmation, Cooper asserts "that [the] enhancement [for "sophisticated means"] was a necessary component of the government's plea offer, and based upon all the known information concerning the conspiracy and Mr. Baghoumian's role in it[, counsel] believed any challenge to the enhancement would be unsuccessful, and could jeopardize the availability of the plea offer." (Cooper Affirm. (Dkt. No. 861) ¶ 5)

Baghoumian also contends that Cooper should have objected to the 20-level enhancement pursuant to § 2B1.1(b)(1)(K) for a loss amount between $7 million and $20 million. While Baghoumian argues – without offering any support – that "the fraudulent billings were . . . $17,725,449 and further that the actual receipt of such billings, the actual loss, was $5,787,859" (No. 14 Civ. 8683, Pet. Br. (Dkt. No. 2-2) at 4), the Government asserts that "[f]rom the outset of the case, [it] has contended that the intended loss here based on the billings submitted to Medicare was over $100 million, and the actual loss, based on the amounts paid, was over $35 million"; the "negotiated range of $7-20 million [was] well below both those

21

figures." (No. 14 Civ. 8683, Govt. Br. (Dkt. No. 19) at 24) Moreover, as this Court noted at sentencing, the two co-defendants who were most similarly situated to Baghoumian had the same stipulated loss amounts. (Sentencing Tr. (Dkt. No. 980) at 25-26)

Given these circumstances, Baghoumian has not demonstrated that Cooper was constitutionally ineffective in failing to object to a loss amount range of $7 million to $20 million. Litigating this issue could have led to the loss of the plea agreement and/or a finding of a much greater loss amount, which would have led to a much higher Guidelines range. Baghoumian has not shown that Cooper's performance in this regard was "so deficient that it falls outside the 'wide range of professionally competent assistance.'" Kovacs, 744 F.3d at 50 (quoting Strickland, 466 U.S. at 690).

Finally, Baghoumian contests the § 2B1.1(b)(2)(c) enhancement for an offense involving 50 or more victims, arguing that "the only victim [of Medicare fraud] is the government." (No. 14 Civ. 8683, Pet. Br. (Dkt. Nos. 2) at 7) Medicare was not the only victim of Baghoumian's fraud, however. As Baghoumian admitted during his plea allocution, he "assisted in submitting the numerous claims to Medicare that [he] knew were related to either fictitious or unknown individuals, as well as fictitious treatments at medical clinics in the United States with the intent to obtain money for which there was no legitimate medical claim." (Plea Tr. (Dkt. No. 978) at 13) Accordingly, Baghoumian's victims included not only Medicare, but all the individuals whose identities were stolen in order to perpetrate the fraudulent scheme.

It was for this reason that Baghoumian's counsel did not challenge the enhancement based on number of victims: "It was [defense counsel's] belief that the number of victim[]s enhancement concerned the stolen identities that were necessary to commit the Medicare fraud, not simply the money paid out by the United States Government." (No. 10 Cr.

22

895, Cooper Affirm. (Dkt. No. 861) ¶ 5)) Counsel's understanding is consistent with the application notes for § 2B1.1(b)(2), which provide that in a case involving means of identification fraud, a "'victim'" includes "any individual whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1 App. Note 4(E). Accordingly, it was not unreasonable for Baghoumian's counsel to agree to the enhancement for number of victims.

## C. Defense Counsel Adequately Argued the Section 3553(a) Factors

Baghoumian also contends that his lawyer did not adequately argue the Section 3553(a) factors at sentencing. (No. 14 Civ. 8683, Pet. Br. (Dkt. Nos. 2-1, 2-2)) Defense counsel's sentencing submissions and remarks at sentencing demonstrate, however, that he competently set forth the relevant Section 3553(a) factors for the Court's consideration. Moreover, Baghoumian raised a substantially similar argument on his direct appeal, which the Second Circuit rejected. See United States v. Baghoumian, 577 F. App'x 86, 87-88 (2d Cir. 2014) ("Here, the record shows that the district court considered not only the nature of Baghoumian's crime and the need for general deterrence, but also numerous potential mitigating factors, including Baghoumian's role in the offense, his limited criminal history, his family ties, and the possible immigration consequences of his conviction.") The "mitigating factors" cited by the Second Circuit were all raised by Baghoumian's counsel at sentencing. (See Sentencing Tr. (Dkt. No. 980) at 11-17)

The Court concludes that Baghoumian's counsel was not ineffective in his presentation of the Section 3553(a) factors.

## **CONCLUSION**

For the reasons stated above, Petitioner's motion to vacate, set aside, or correct

his sentence is denied. The Clerk of Court is directed to close this case. Any pending motions

are denied as moot.

Dated: New York, New York
       May 21, 2019

SO ORDERED.

Paul G. Sardephe

Paul G. Gardephe
United States District Judge

24